Park v DeJonge (2024 NY Slip Op 51274(U))

[*1]

Park v DeJonge

2024 NY Slip Op 51274(U)

Decided on September 15, 2024

Supreme Court, Kings County

Maslow, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 15, 2024
Supreme Court, Kings County

Vandell Park, Plaintiff,

against
Fern E. DeJonge, Esq., Defendant.

Index No. 537/2024

Vandell Park, plaintiff pro se. 
Fern E DeJonge, defendant pro se.

Aaron D. Maslow, J.

The following papers were used on this (non-efiled) motion:
Plaintiff's Papers
Order to Show Cause
Verified Petition
Affidavit of Emergency
Part 130 Certification Legal Back
Part 130 Verification
E-mail Notification to Defendant Regarding Filed Order to Show Cause
Exhibit A - Good Faith Letter to Defendant
Exhibit B - Client Invoices, Billing Notices
Exhibit C - Communications between Parties
Affidavits of Service
Miscellaneous Papers
Requisitioned by Court
Transcript of Proceedings, July 12, 2024
Background
This action concerns whether a non-attorney who enters into a fee-splitting contract for a [*2]percentage commission of an attorney's fees from clients possesses a cause of action for breach of the contract in light of Judiciary Law § 491's prohibition against attorneys' sharing of compensation, and the right to, in effect, an accounting of the attorney's billings and receipts.
Vandell Park ("Plaintiff Park" or "Park") is the plaintiff in this action and brings forth, in essence, a breach of contract claim against his former employer and the defendant in the action, Fern DeJonge, Esq. ("Defendant DeJonge" or "DeJonge")[FN1]
, who is his cousin. DeJonge is a licensed attorney in the state of New York and is self-employed as a solo general practitioner in Kings County, New York. Both parties have elected to represent themselves pro se.
This matter was brought on via an order to show cause, signed by the Hon. Francois Rivera on July 3, 2024, a verified petition, and various other supporting papers, including exhibits. The order's provisions stated that personal service had to be made on or before July 8, 2024, and an affidavit of service had to be presented to the Court on the return date. There was no summons and complaint nor other papers by which an action is commenced.
Since this Court commenced serving as a Supreme Court Justice in January 2023, it has noticed that various pro se plaintiffs have commenced lawsuits via order to show cause and verified petition and not by summons and complaint. The Court surmises that this is occurring because the pro se plaintiffs are obtaining blank template order to show cause and verified petition forms from the Help Center of Supreme Court, Kings County, and are completing them without also completing a summons and complaint. Apparently, since "the Kings County Court Help Center is prohibited by law from giving legal advice and can not complete forms on your behalf" (https://ww2.nycourts.gov/courts/2jd/kings/civil/helpcenter.shtml [last accessed Sept. 14, 2024]), pro se plaintiffs are bypassing the CPLR's requirements concerning how to commence actions.
While an order to show cause may bring on a motion within an action, for instance one which seeks a preliminary injunction, nonetheless there would still need to be papers commencing the action, such as a summons and complaint, a summons with notice, or a summons with motion for summary judgment in lieu of a complaint. The Help Center's website indeed does provide a copy of a summons and complaint, contained within a 14-page PDF file accessible through the link, "How to Commence a Civil Action," on the page appearing at 
https:/ww2.nycourts.gov/courts/2jd/kings/civil/helpcenter.shtml. Pro se plaintiffs would be well served by reading this PDF file initially, prior to submitting formal papers to the court. In that way, an action could be commenced so that any motion brought on would constitute an application for relief incidental to the action.
It is true that an order to show cause can commence a special proceeding but the subject matters of special proceedings are limited. They certainly do not encompass the subject matter of this lawsuit, which was a simple breach of contract claim.
At the hearing held on the return date in this case, July 12, 2024, the Court pointed out to Plaintiff Park that he commenced this matter with an order to show cause and verified petition but there was no summons and complaint. Neither was there a cited statute for maintaining this as a special proceeding. Rather than dismiss this matter for lack of compliance with the CPLR's formalities for commencing an action, the Court elected to treat the filed order to show cause and verified petition as a summons and motion for summary judgment since CPLR 2101 (f) permits [*3]a court to disregard a defect in a paper's form if a substantial right of a party is not prejudiced (see tr at 26- 28). Defendant DeJonge was not prejudiced by the Court's treatment of Plaintiff Park's papers since the papers elucidated his claim and requested relief. The Court permitted the parties to make oral argument under oath since factual matters were being alleged.

Whether the "Affix and Mail" Service was Proper under CPLR 308 (4)
At the outset of oral argument, the Court engaged in a review of the means by which the order to show cause and papers upon which it was granted were served.
The order to show cause signed by Hon. Justice Rivera required "personal service." That implicates the provisions of CPLR 308, which deals with personal service upon a natural person.
CPLR 308 requires that the defendant be served by one of several modalities. Paragraph 1 calls for delivery to the person to be served. Paragraph 2 calls for delivery to "a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business in an envelope bearing the legend 'personal and confidential' and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served, such delivery and mailing to be effected within twenty days of each other. . . ."
Further relevant are the provisions in paragraph 4 of CPLR 308, which provide, "[W]here service under paragraphs one and two cannot be made with due diligence, [service can be made] by affixing the summons to the door of either the actual place of business, dwelling place or usual place of abode within the state of the person to be served and by either mailing the summons to such person at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business in an envelope bearing the legend 'personal and confidential' and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served, such affixing and mailing to be effected within twenty days of each other. . . ."
"Service of process upon a natural person must be made in strict compliance with the statutory methods of service outlined in CPLR 308" (HSBC Mtge. Corp. (USA) v Hollender, 159 AD3d 883, 883 [2d Dept 2018]). Therefore, it is only upon the exercise of "due diligence" that a plaintiff, when the above provisions of paragraphs 1 and 2 are found to be unavailable, may attempt affix and mail service, commonly referred to as "nail and mail" service (see CPLR 308 [4]). Due diligence has been construed by the Second Department to mean "a few visits on different occasions and at different times to the defendant's residence or place of business when the defendant could reasonably be expected to be found at such locations at those times" (Ramirez v Escobar, 228 AD3d 791, 792 [2d Dept 2024], quoting Estate of Waterman v Jones, 46 AD3d 63, 66 [2d Dept 2007]; see HSBC Mtge. Corp. (USA) v Hollender, 159 AD3d at 883; Wells Fargo Bank, NA v Besemer, 131 AD3d 1047, 1048 [2d Dept 2015]).
In the case at bar, service pursuant to paragraphs 1 and 2 of CPLR 308 was not effectuated as personal delivery was not made to Defendant DeJonge herself, nor was substituted service completed successfully. Plaintiff Park employed Miguel Gedeon's services to serve DeJonge at her home address on multiple occasions; however, she was informed by an unidentified female voice that DeJonge was not home (see Miguel Gedeon aff). Since nobody [*4]answered the door to accept the papers, service under the first two prongs of CPLR 308 was deemed impracticable. Therefore, to satisfy the "due diligence" prong, Park should have directed service to DeJonge's firm, which was located at a separate location. Since Park worked for DeJonge and likely knew DeJonge's hours and habits, Park should have directed service to her office to satisfy due diligence for purposes of moving on to "nail and mail" service under CPLR 308 (4). (See Ramirez v Escobar, 228 AD3d at 792; Prego v Bartkowski, 216 AD3d 679, 681 [2d Dept 2023].)
In an attempt to comply with the mandate for personal service, Gedeon mailed the order to show cause and supporting papers via overnight express delivery through the United States Postal Service (USPS) on July 5, 2024. A receipt confirming the method of delivery was provided to the Court, as well as an affidavit of service. However, the order to show cause was not affixed to DeJonge's door. Instead, on July 8, 2024, it was placed in DeJonge's mailbox. Park observed Gideon placing the document in the mailbox, confirming to the Court that such service was completed and noting that the mailing was not affixed to the door. (See tr at 8.)
Ultimately, Park failed to comply with the requirements of CPLR 308 (4) to acquire personal jurisdiction over DeJonge. The Court looks to the statute's plain language as to whether affix and mail service is proper if the envelope is placed in a mailbox. CPLR 308 (4) states that the summons — or order to show cause as presented in the facts here — must be served by "affixing the summons to the door" of either the dwelling place, usual place of abode, or business of the defendant (see CPLR 308 [4] [emphasis added]). Since the rule does not permit placing the summons in a defendant's mailbox to satisfy the affixation component of service, the Court looks to the Second Department for guidance.
The Appellate Division has strictly held that "the plaintiff must demonstrate that the summons was affixed to the door of the dwelling place or usual place of abode" (Deutsche Bank Natl. Trust Co. v O'King, 148 AD3d 776, 777 [2d Dept 2017]; see US Bank N.A. v Henry, 219 AD3d 854 [2d Dept 2023]; Matter of Ferrara v Serrano, 189 AD3d 1230 [2d Dept 2020]). Indeed it has been held that service of papers by placing them in a mailbox instead of affixing them to the door constitutes improper service (see Matter of Fratello v Kruger, 64 AD2d 937 [2d Dept 1978]).
Nonetheless, this Court holds that despite the obvious deficiency in serving the order to show cause and supporting papers, it is not a bar to making a determination on the merits. DeJonge made an application at oral argument to put in opposition papers (see tr at 2), and the Court denied it due to noncompliance with the Part Rules concerning adjournments (see id. at 3-4, 28).[FN2]
DeJonge could have asserted the improper service in her oral argument to the Court but [*5]she did not do so. It was the Court which raised the service issue. Since DeJonge formally and actively litigated this matter and its merits before the Court — and did not object to the manner in which the papers were served even after the Court sua sponte discussed the subject — the Court finds that the matter of improper service should not be held against Park, relying on a series of cases holding that improper service of an order to show cause can be waived as an issue (see Matter of Montal v Koplen, 220 AD3d 824 [2d Dept 2023]; Matter of Sasson v Board of Elections in City of NY, 65 AD3d 995 [2d Dept 2009]; Matter of Gregory v Board of Elections of City of NY, 93 AD2d 894 [2d Dept], affd 59 NY2d 668 [1983]).
Thus, the Court shall proceed to a discussion of the underlying dispute.

Whether the Fee-Splitting Agreement is Enforceable
Plaintiff Park's claim against Defendant DeJonge sounds in breach of contract. In support of it, Park submitted various documents. Both parties testified and responded to questions from the Court.
The parties are cousins and commenced a professional relationship in 2017 via an oral contract in which DeJonge agreed to provide Park employment as a legal assistant in her firm. Park participated in numerous aspects of client work, including clerical work and limited legal work, under the guidance of DeJonge. He even brought it a few clients. The parties agreed that Park would be compensated with 33% of whatever DeJonge received in attorney's fees upon completing a client's case, so long as Park participated in that client's case. This arrangement continued until April 2021, when DeJonge reduced the commission rate to 23%. Once again, the parties agreed via an oral contract. However, Park alleges that DeJonge stopped being forthcoming about the amounts clients have paid her and, therefore, Park was unable to ascertain the commission payments which he claimed he was entitled to.
As Park alleged in his verified petition where the template form instruction was to describe all facts concerning the claims being made,
3. . . . The Defendant retain[ed] the services of the Plaintiff by way of a verbal contract in [*6]2017, October, offering to pay the Plaintiff 33% commission for work done for clients of her office. In April 2021, the Defendant reduced the Plaintiff's commission to 23% for work done for Clients of her office.
4. The Defendant has not been transparent with regards to payments made by Clients to her office, claiming that she does not have to tell the Plaintiff how much money the Clients pay, thus the Plaintiff cannot accurately calculate his commission. Plaintiff wants to calculate his commission accumulation. Thus he must be shown payment statements of monies paid to the Defendant.
5. Please accept Plaintiff's good faith letter to the Defendant as an explanation of Plaintiff's request of this Court. Plaintiff is asking base[d] on his good faith letter, an immediate payment of $10,000.00 for Plaintiff has no money to take care of his basic needs.
6. Plaintiff is asking for Defendant to immediately produce invoices and payments for clients: (1) Leslie Walker / Rita Malone estate
(2) Judy Lyons divorce
(3) Merlyn Osbourne; (4) Ann Marie / Colin Weeks.
(Verified pet ¶¶ 3-6.)
In responding to the verified petition where the template form instructs one to identify attached documents, Park wrote:
Exhibit A shows the detail break down of the case and monies owed and outstanding. (2) Exhibit B shows the invoices and payment statement by Claudia James client. (c) Show why I requested monies. (Id. ¶ 7.)
Finally, in completing the blank lines in the Wherefore clause, Park wrote that he prayed of the Court for
An immediate payment of $10,000.00 for the Defendant collected moneys and has not paid the Plaintiff commission.
(2) That the Defendant produce all financial payment statements by all Clients the Plaintiff worked on so that the Plaintiff can accurately calculate his commission. (Id. Wherefore cl.)
Defendant DeJonge characterized the agreement with Plaintiff Park as a percentage-based model, stating to the Court, and referencing the original agreement, that "All the matters that I worked on, including the ones with the agreement, was I would pay you 33 percent on the clients that you worked on" (tr at 21, lines 2-4). DeJonge was unable to provide hourly, weekly, or monthly compensation, opting instead to pay Park a percentage of her earnings made from clients, "Because that is the money I have in hand. I can only pay you [Mr. Park] what I have in hand" (id. at 17, lines 8-9). DeJonge further supported her reasoning for a fee-splitting model, stating, "Mr. Park has a problem that has a negative impact on his ability to go out and work, and I offered him an hourly basis. That's what I have done in the past, but he said, "No. Can you give me a percentage?" I was like no but then I said you know what, he is a family of six. So I looked [*7]out for him for a few years, then I realized this is negatively impacting my ability to pay my bills and so I said I will do it 23 percent of what I received then after, I said I can't do this anymore." (Id. at 17, lines 14-22.)
Park alleged that DeJonge owed him $23,000.00, of which he sought an immediate $10,000.00 in his order to show cause. Park stated he can wait for the remaining $13,000.00. The $10,000.00 sum stemmed from Park's participation in cases of three clients, all of whom Park believed paid DeJonge, but Park had yet to receive his agreed-upon percentage. (See id. at 29-30.)
The transcript of the proceedings before the Court on July 12, 2024 leaves no doubt in this Court's mind that the agreement between Plaintiff Park and Defendant DeJonge was grounded in a commission form of payment. Aside from the above-quoted portions, the transcript contains the following also:
• THE DEFENDANT: . . . I sacrificed myself by giving him a third of what people paid me but then when I realized it had a negative impact on my financial circumstances, I said, "Oh, no. I cannot do that." There is a misunderstanding there. I said, "I cannot do that 33 percent anymore." I did say that. (Id. at 12, lines 18-25.)
• THE PLAINTIFF: I'm calculating monies that are outstanding based on invoices that are sent out (id. at 13, lines 24-25).
• THE COURT: . . . Initially, is it correct that initially you agreed to pay Mr. Park 33 percent of the work done for the clients based on what you actually received from them?
THE DEFENDANT: That is correct, Your Honor. (Id. at 14, lines 10-16.)
• THE COURT: Mr. Park says in April of 2021 the defendant reduced the plaintiff's commission 33 percent for work done for clients in her office. Is that accurate?
THE DEFENDANT: What is accurate is I reduced it to 23 percent for work he worked on versus 
THE COURT: So he would get 23 percent of what you got in?
THE DEFENDANT: Not the entirety because there were things that I would work on by myself that he had nothing to do with.
THE COURT: So 23 percent of what you worked on but what was that 23 percent based on?
THE DEFENDANT: Not the invoice.
THE COURT: Not the invoice, just based on money you collected?
THE DEFENDANT: Money received.
THE COURT: Were there any cases that you handled where he was paid in full the percentage?
THE DEFENDANT: Of course.
THE COURT: Per your agreement with him?
THE DEFENDANT: Of course, several. (Id. at 16, lines 2-22.)
• THE PLAINTIFF: . . . Ms. Dejonge said to me initially, "I am not able to pay you on an hourly basis. I am not able to pay you weekly. I am not able to pay you monthly. If you are prepared to work for a commission, we can work together." I agreed to work with Ms. Dejonge on a commission. (Id. at 18, line 25, through 19, line 4.)
• THE PLAINTIFF: Yes, Ms. Dejonge started paying me based on our agreement of 33 percent from 2017. She paid me on the 33 percent basis that we agreed upon to work. I [*8]had no issue with that. . . . Ms. Dejonge has made only two other payments on Ms. Lawrence's invoice of $33,000, leaving an outstanding amount of 6,000 based on my 33 percent commission. . . . There were two incidents that led me to start checking because I keep asking Ms. Dejonge time and again, can you let me know which client has paid so that I can accurately calculate my commission. (Id. at 19, lines 9-25.)
• THE PLAINTIFF: I'm simply saying to Ms. Dejonge you asked me to work for you on a commission basis. In order for me to calculate my commission accurately, I need to know how much money was paid. (Id. at 20, lines 20-23.)
• THE PLAINTIFF: I am not asking for anything outside of that, just my 33 percent. In order for me to calculate my 33 percent, I need to know if the client paid. (Id. at 21, lines 5-7.)
• THE DEFENDANT: I probably took maybe eight months to pay him his commission (id. at 22, lines 16-17).
The actual dispute appears to have been whether the percentage based fee to Park was to be calculated off the amount billed to clients or the amount they actually paid (see id. at 13-14, 16, 18-19). As stated by DeJonge, "[F]or him to come and say that I owe all these monies based on the invoices versus what I received, that's horrible" (id. at 18, lines 14-16).
As noted above, Defendant DeJonge sought an adjournment so that she could put in opposition based on a review of records (see supra at 4). Not only was there no compliance with Part Rules requiring a written adjournment request in advance but, as discussed herein, the determination of this cause of action by Plaintiff for breach of contract can be made as a matter of law due to the nature of the arrangement between the parties.
Upon a review of the parties' characterizations of their oral employment contract, it is apparent that this agreement was based upon impermissible fee splitting between an attorney and a non-attorney.[FN3]
Judiciary Law § 491 provides in pertinent part: "It shall be unlawful for any person, partnership, corporation, or association to divide with or receive from, or to agree to divide with or receive from, any attorney-at-law or group of attorneys-at-law, whether practicing in this state or elsewhere, either before or after action brought, any portion of any fee or compensation, charged or received by such attorney-at-law. . . . But this section does not apply to an agreement between attorneys and counsellors-at-law to divide between themselves the compensation to be received."
In an action commenced by a non-attorney, where the defendant attorney fails to raise as a defense to a claim for payment that it was based on impermissible fee splitting, a court may do so (see Matter of Ungar v Matarazzo Blumberg & Assoc., P.C., 260 AD2d 485 [2d Dept 1999]). In Matter of Ungar, the former administrator and claims manager for the defendant two-attorney law firm sought injunctive relief in connection with a pending arbitration against them. His compensation was to equal that of the two attorneys. Any dividends, earnings and/or profits of the law firm were to be distributed in an equal amount as a bonus to the administrator-claims manager. If the latter's employment were terminated, he was entitled to a payment equivalent to [*9]one-third of the value of the law firm. An example of the compensation agreement was that if a fee was nine dollars, the administrator-claims manager would receive three dollars. The agreement also provided that the administrator-claims manager and his wife were afforded the right to examine all the books, records, and files of the law firm. Any dispute was to be resolved by arbitration.
The law firm in Matter of Ungar terminated the administrator-claims manager's employment. He and his wife demanded arbitration and commenced an Article 75 proceeding to compel discovery in aid of arbitration, among other things. While the Supreme Court granted that branch of the petition which was to compel discovery, the Appellate Division reversed:
Upon our review of the terms of the parties' agreement, we conclude that it is an agreement between a nonlawyer and attorneys to split legal fees which is prohibited by Judiciary Law § 491 (see, Gorman v Grodensky, 130 Misc 2d 837; Stern, Henry & Co. v McDermott, 38 Misc 2d 50, affd 19 AD2d 864; see also, Code of Professional Responsibility DR 3-102 [22 NYCRR 1200.1]). While this issue was not raised by the parties, we may consider it sua sponte (see, Matter of Niagara Wheatfield Adm'rs Assn. [Niagara Wheatfield Cent. School Dist.], 44 NY2d 68, 72; Matter of Town of Greenburgh [Police Assn.], 94 AD2d 771, 772; Muscarella v Muscarella, 93 AD2d 993, 994).
Regardless of the terminology which purports to save the agreement by labeling the payments to Ungar as compensation and bonuses, the agreement, in essence, provides that Ungar and the appellants will share equally in the profits of the firm, which, under the circumstances, constitutes illegal fee-splitting (see, United Calendar Mfg. Corp. v Tsung C. Huang, 94 AD2d 176; Gorman v Grodensky, supra). In particular, the termination and death benefits are explicitly calculated, in part, as a percentage of the fees earned.
A party may not seek the assistance of the courts in enforcing an illegal contract (see, United Calendar Mfg. Corp. v Tsung C. Huang, supra, at 180). Consequently, we decline to compel the discovery sought by the petitioners pursuant to the terms of the agreement.
(Matter of Ungar v Matarazzo Blumberg & Assoc., P.C., 260 AD2d at 486.)
In Bonilla v Rotter (36 AD3d 534, 534 [1st Dept 2007]), it was held as follows:
"It is the settled law of this State . . . that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose" (Stone v Freeman, 298 NY 268, 271 [1948]; see Carmine v Murphy, 285 NY 413 [1941]; Sabia v Mattituck Inlet Mar. & Shipyard, Inc., 24 AD3d 178 [2005]). The agreement alleged by plaintiff is one between a nonlawyer and attorneys to split legal fees which is proscribed by Judiciary Law § 491. Accordingly, the agreement is illegal and plaintiff is foreclosed from seeking the assistance of the courts in enforcing it (see Prins v Itkowitz & Gottlieb, 279 AD2d 274 [2001]; Matter of Ungar v Matarazzo Blumberg & Assoc., 260 AD2d 485 [1999]; see also Van Bergh v Simons, 286 F2d 325 [*10][2d Cir 1961]). While defendants failed to raise the illegality of the agreement before Supreme Court, "[w]here, as here, a party does not allege new facts but, rather, raises a legal argument which appeared upon the face of the record and which could not have been avoided if brought to the opposing party's attention at the proper juncture, the matter is reviewable" (Chateau D' If Corp. v City of New York, 219 AD2d 205, 209 [1996] [internal quotation marks, ellipsis and brackets omitted]).
With the exception of circumstances not applicable to the case at bar (involving deceased attorneys or retirement plans), "A lawyer or law firm shall not share legal fees with a nonlawyer" (Rules of Professional Conduct [22 NYCRR 1200.0] rule 5.4 [a]).
A violation of Judiciary Law § 491 constitutes a serious crime (see Matter of D'Emic, 111 AD3d 158 [2d Dept 2013]; Matter of Felman, 259 AD2d 68 [2d Dept 1999]). Since a fee-sharing agreement with a non-attorney is criminal in nature and not merely prohibited by statute, the non-attorney plaintiff would not even be entitled to equitable relief in the form of quantum merit or unjust enrichment (see Ballan v Sirota, 163 AD3d 516, 517 [2d Dept 2018], affg 2015 WL 4197960 [Sup Ct, Queens County 2015] [law firm agreed to pay a consultant in securities cases 20% of fee]).
Inasmuch as the agreement sought to be enforced violated Judiciary Law § 491's prohibition against fee sharing between an attorney and a non-attorney, "the [C]ourt will not assist either party in the enforcement of this contract" (Rasiak v Gilliam, 2001 WL 36381427 [Sup Ct, NY County 2001]). This result is compelled even though the issue was raised sua sponte by the Court (see Matter of Ungar v Matarazzo Blumberg & Assoc., P.C., 260 AD2d at 485).[FN4]
Not only is this Court prohibited from ordering Defendant DeJonge to pay Plaintiff Park any money based on their illegal agreement, but this Court may not aid Park in his claim by directing DeJonge to disclose her client billings and fee receipts, akin to ordering an accounting (see Matter of Ungar v Matarazzo Blumberg & Assoc., P.C., 260 AD2d 485 [court denied disclosure in aid of arbitration of illegal fee-sharing agreement]).
Accordingly, the within summons and motion for summary judgment, styled originally as an order to show cause and verified petition, is dismissed. Plaintiff's application to enforce the terms of the subject agreement, which is illegal, and for relief which in essence is for an accounting, is DENIED in all respects.
E N T E R
AARON D. MASLOW
Justice of the Supreme Court of the State of New York

Footnotes

Footnote 1:The court reporter has spelled the defendant's last name as "Dejonge."

Footnote 2:From the transcript:
• THE COURT: Okay, Part 2 Rules, Subpart D subsection 1, standards and procedures for seeking an adjournment. All adjournments are at the discretion of the Court. A request for an adjournment shall be made through a stipulation or if consent is not received from other counsel, through an application. Stipulations of adjournment and applications for adjournment shall be submitted through NYSCEF with a copy sent by email to the part clerk and the law clerks in a paper filed case. Stipulations or adjournment and applications for adjournment shall be filed with the Court at motion support room 227 at 360 Adams Street with a copy served upon all other counsel or self-represented parties and a copy shall be emailed to the part clerk and the law clerks. The deadline for filing such stipulations of adjournments and applications for adjournments shall be five p.m. of the third court business day prior to the scheduled motion date. See Shmerelzon v Gravesend Management Inc., Misc 3d 1233(a) 2023 NY Slip Op 5115 U Supreme Court kings county 2023. Section 2, late requests for adjournment. An application for an adjournment or stipulation of adjournment has not been submitted in the foregoing manner and counsel still wishes to apply for an adjournment applications shall be in person for scheduled motion date when the motion is called. Since an adjournment is at the Court's discretion counsel, shall be prepared to orally argue the motion if the adjournment application is denied. (Tr at 3, line 2, through 4, line 3.)

• [THE COURT:] However, nonetheless, Ms. Dejonge did not comply with the rules which require adjournments be made as a stipulation application at least three court business days in advance, so Ms. Dejonge, I'm denying your application for an adjournment (id. at 28, lines 21-25).

Footnote 3:. Page 23, lines 21-22, of the transcript contain the following:

 THE COURT: You are not admitted as an attorney?
THE PLAINTIFF: No, I am not.

Footnote 4:At oral argument, the Court raised the issue:
 [THE COURT]: I also have to consider whether this whole agreement in the first instance with the 33 percent commission to start things off is even a valid agreement based on the provisions of the judiciary law, So the contract may not be valid anyway under Judiciary Law [491] which deals with fee splitting between attorneys and non- attorneys. So these are all matters that I have to consider. (Tr at 29, lines 5-12.)